CAMPBELL FIRM, PC
Christopher B. Campbell (Bar No. 254776)
*chris@thecampbellfirm.com*
455 Market Street, Suite 1940 #809197
San Francisco, California 94105
Telephone: +1.510.588.2200

Attorney for Defendant Suno, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN THE MATTER OF A DEPOSITION SUBPOENA SERVED IN:<br><br>UMG RECORDINGS, INC., CAPITOL RECORDS, LLC and SONY MUSIC ENTERTAINMENT,<br><br>Plaintiffs,<br><br>v.<br><br>SUNO, INC., and JOHN DOES 1-10,<br><br>Defendants. | Case No. 3:26-MC-80303-VKD<br><br>**SUNO, INC.'S OPPOSITION TO NON-PARTY APPLE INC.'S MOTION TO QUASH DEPOSITION SUBPOENA OR, IN THE ALTERNATIVE, MOTION FOR PROTECTIVE ORDER**<br><br>Date: December 1, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Virginia K. DeMarchi<br>Courtroom: 2 |

## STATEMENT OF THE ISSUES TO BE DECIDED

1. Whether Apple has met its burden to quash Suno's Rule 45 deposition subpoena, where the four narrowed topics seek testimony directly relevant to Plaintiffs' theory of harm and Suno's fair use and copyright misuse defenses, the testimony is not available from Plaintiffs, Apple has offered no evidence of undue burden, and any confidentiality concerns are addressed by the protective order in the underlying litigation.
2. Whether Apple, in the alternative, has shown good cause under Rule 26(c) for a protective order barring the deposition.

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 2

A. Suno's Music Generation Tool .......... 2

B. Plaintiffs' Claims and Suno's Defenses .......... 3

C. Apple Music Is Directly Relevant to the Underlying Litigation .......... 5

D. Suno's Efforts to Seek Relevant Testimony From Apple .......... 9

III. ARGUMENT .......... 10

A. Legal Standard .......... 10

B. The Four Topics at Issue Are Directly Relevant to the Claims and Defenses in the Case .......... 12

1. Apple's Contract Negotiations With Plaintiffs And Implementation of Such Contracts Are Relevant .......... 13

2. Apple's Assessment of the Commercial Viability of Its Platform Without Plaintiffs' Content Is Relevant .......... 15

3. Apple's Approach to Streaming Fraud Is Relevant .......... 17

4. Apple's Communications With Plaintiffs Regarding Suno Are Relevant .......... 18

C. The Four Topics Are Not Equally Obtainable From Party Discovery .......... 18

D. Confidentiality Is Not a Bar to a Deposition .......... 21

E. Apple Has Not Shown Any Undue Burden .......... 23

F. A Protective Order Is Also Inappropriate .......... 23

G. Transfer Pursuant to Rule 45(f) .......... 24

IV. CONCLUSION .......... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406 (C.D. Cal. 2014) .......... 19

*ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527 (N.D. Cal. 2015) .......... 11

*Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470 (9th Cir. 1992) .......... 12

*Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619 (9th Cir. 1999) .......... 13

*Centurion Indus., Inc. v. Warren Steurer and Assoc.*, 665 F.2d 323 (10th Cir. 1981) .......... 12

*Covetrus, Inc. v. Actian Corp.*, No. 21-cv-00097, 2024 WL 4581285 (D. Me. Oct. 25, 2024) .......... 16

*Fausto v. Credigy Servs. Corp.*, No. C 07-5658, 2008 WL 4793467 (N.D. Cal. Nov. 3, 2008) .......... 12, 23

*Gilead Sciences, Inc. v. Merck & Co.*, No. 5:13-cv-04057, 2016 WL 146574 (N.D. Cal. Jan. 13, 2016) .......... 13

*Gonzales v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006) .......... passim

*Hager v. Ariosa Diagnostics, Inc.*, No. 23-mc-80261-LB, 2023 WL 8654388 (N.D. Cal. Dec. 14, 2023) .......... 11

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .......... 20

*In re Subpoena to Apple Inc.*, 2014 WL 2798863 (N.D. Cal. June 19, 2014) .......... 19

*In re Subpoena to Produce Documents of Clapp, Moroney*, 2014 WL 3784112 (N.D. Cal. July 31, 2014) .......... 19

*Intermarine, LLC v. Spliethoff Bevrachtingskantoor, B.V.*, 123 F. Supp. 3d 1215 (N.D. Cal. 2015) .......... 19

*La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481 (N.D. Cal. 2012) .......... 11

*Lantiq Deutschland GmbH v. Ralink Tech. Corp.*,
No. C-11-00234 EJD (PSG), 2011 WL 13394713 (N.D. Cal. Sept. 15, 2011).................... 11

*Lasercomb Am., Inc. v. Reynolds*,
911 F.2d 970 (4th Cir. 1990) ............................................................................ 15, 20

*Personal Audio LLC v. Togi Entertainment, Inc.*,
No. 14-mc-80025 RS (NC), 2014 WL 1318921 (N.D. Cal. Mar. 31, 2014)........................ 19

*Philhower v. Philhower*,
No. 8:24-cv-00074, 2024 WL 4720932 (C.D. Cal. Oct. 15, 2024) ............................... 11, 23

*Practice Management Information Corp. v. American Medical Ass'n*,
121 F.3d 516 (9th Cir. 1997) ............................................................................ 16, 20

*Price v. Peerson*,
No. CV 13-03390, 2014 WL 12687411 (C.D. Cal. Apr. 8, 2014) ..................................... 19

*Soto v. Castlerock Farming & Transp., Inc.*,
282 F.R.D. 492 (E.D. Cal. 2012)......................................................................... 11, 19

*SPS Technologies, LLC v. Briles Aerospace, Inc.*,
2019 WL 13108018 (C.D. Cal. June 24, 2019)............................................................ 23

*Travelers Indem. Co. v. Metro. Life Ins. Co.*,
228 F.R.D. 111 (D. Conn. 2005) .......................................................................... 11

*Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*,
813 F.2d 1207 (Fed. Cir. 1987) ........................................................................... 11

*United States v. Capriotti*,
No. 1:11-cv-847, 2012 WL 2994244 (E.D. Cal. July 20, 2012) .................................. 12, 23

*Waymo LLC v. Uber Techs., Inc.*,
No. 17-cv-00939, 2017 WL 2929439 (N.D. Cal. July 7, 2017) .............................. 10, 13, 22

*Williams v. County of San Diego*,
No. 17-cv-00815-MMA (JLB), 2019 WL 5963969 (S.D. Cal. Nov. 13, 2019)............. 12, 13

**STATUTES**

17 U.S.C. § 107 ................................................................................................. 5, 14, 20

**RULES**

Fed. R. Civ. P. 26................................................................................................ 10, 11, 12

Fed. R. Civ. P. 45................................................................................................ 10, 12, 24

## I. INTRODUCTION

Plaintiffs UMG and Sony, two of the world's largest record labels, sued Suno for alleged copyright infringement of their sound recordings in the United States District Court, District of Massachusetts. *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS (D. Mass.) ("Massachusetts Litigation"). They allege that Suno trained its generative AI music tool on their recordings, and that Suno users generate music that is flooding streaming services like Apple Music, "eroding" Plaintiffs' market share and "diluting" the royalty pools those services pay out. Apple now asks the Court to prevent Suno from asking Apple a single question on these exact issues.

Apple casts itself as a bystander whose "sole connection" to this case is that its service is one of several places where music "can be played." Non-Party Apple Inc.'s Motion to Quash Deposition Subpoena Or, In The Alternative, Motion for Protective Order, Dkt. 1 ("Mot.") at 1:7-9.[1] But Plaintiffs made Apple Music central to this case. Plaintiffs' complaint explicitly names Apple Music as a destination for Suno outputs. Plaintiffs' theory of market harm depends on what happens on platforms like Apple's, one of the labels' biggest digital music partners. Plaintiffs have also focused on Apple specifically in their campaign to eliminate or demonetize AI-generated music across all music streaming platforms. Plaintiff UMG calls anti-AI terms [redacted] and [redacted] Yet when Suno asked Plaintiffs' witnesses [redacted]. As UMG's lead negotiator put it when asked about [redacted] That is exactly what Suno now seeks to do.

Suno has been more than reasonable in seeking targeted deposition testimony from Apple. It accepted a declaration in place of testimony on five of the nine noticed topics and on

---

[1] Citations to Apple's Motion, deposition transcripts (Campbell Decl., Exs. 4-8), and the earnings call transcript (Campbell Decl., Ex. 10) are to the document's internal page and line. Citations to the First Amended Complaint (Campbell Decl., Ex. 1), the Protective Order (Campbell Decl., Ex. 13), and declarations are to the relevant paragraph number. Citations to all other exhibits are to the ECF page number of the exhibit as filed.

many portions of its document subpoena; it offered to exclude past and signed agreements from the deposition; and it carved the technical details of Apple's fraud-detection methods out of the streaming fraud topic to address Apple's purported concerns. What remains in dispute are four narrow deposition topics:

- Apple's current license negotiations with Plaintiffs;
- whether Apple has evaluated its ability to operate Apple Music without one or both of Plaintiffs' catalogs;
- the alleged streaming fraud Plaintiffs invoke to justify their demands for anti-AI deal terms; and
- Apple's communications with Plaintiffs about Suno and this case.

Each topic goes to the heart of Plaintiffs' alleged harm and to Suno's fair use and copyright misuse defenses.

The testimony Suno seeks is also not available in party discovery. Plaintiffs' witnesses testified they do not have insight into Apple's knowledge or business positions, and Apple is clearly in the best position to testify about how Apple has operationalized the many obligations reflected in its contractual agreements and negotiations with Plaintiffs. Nor has Apple established any burden in preparing a corporate witness on these narrow topics. Finally, Apple's concerns about confidentiality do not hold water; the underlying litigation is governed by a robust protective order that provides, among other things, for a "Highly Confidential – Outside Counsel Only" designation. Indeed, Apple has already availed itself of this protective order when producing documents and declarations. The Motion should be denied.

## II. FACTUAL BACKGROUND

### A. Suno's Music Generation Tool

Suno is a technology company that allows individuals to create new music using a transformative generative artificial-intelligence tool. The foundation of that tool is a computer program constructed by showing the program millions of instances of different kinds of music and sound recordings. By analyzing their constitutive elements, the program derived a complex statistical model of the auditory characteristics of the recordings—e.g., what types of sounds

typically appear in certain genres, what a pop song tends to sound like, how the drumbeat varies from country to rock to hip-hop, and so on. The resulting tool allows ordinary people to use plain-English descriptions of genres, styles, and other musical elements to create new music, making Suno an engine for effectively limitless creativity. For example, a prompt to Suno to generate a song in the style of early 1980s "new wave" synth-pop, with an upbeat tempo but a somber feel, will yield an audio file with the characteristic instrumentation, timbres, and overall gestalt of the category described. Users can also instruct the tool to incorporate their own original song lyrics and information into the auditory output.

**B. Plaintiffs' Claims and Suno's Defenses**

Plaintiffs UMG and Sony are major record labels that control a substantial share of the music recordings streamed, purchased, and listened to by U.S. consumers. Plaintiffs' core allegation is that Suno's generative AI tool was trained on a discrete subset of Plaintiffs' sound recordings (the "Universal Works" and the "Sony Works," collectively the "Asserted Works"), an act that Plaintiffs contend was copyright infringement. Declaration of Christopher B. Campbell filed herewith ("Campbell Decl."), Ex. 1 (First Am. Compl. ("FAC") ¶¶ 9, 19-21, 38).

Two points bear emphasizing. First, this initial copying during Suno's training phase was wholly internal, and Plaintiffs do not allege that Suno then distributed or attempted to monetize any actual copies of Plaintiffs' copyrighted works. FAC ¶ 89 (alleging only that Suno used reproductions of the Universal Works and Sony Works "to train its generative AI models"). Second, Plaintiffs also do not contend that any *outputs* from Suno's generative AI tool infringe on their copyrighted works; in fact, they disclaim that allegation. *Id.* ¶ 53.

As a result, Plaintiffs have been forced to pursue an incredibly broad and generalized theory of harm. In particular, Plaintiffs assert that the mere existence of *non*-infringing Suno-generated outputs on digital service provider ("DSP") platforms like Apple Music causes them harm, claiming these outputs divert listeners from Plaintiffs' recordings and are eroding Plaintiffs' share of the market. Specifically, Plaintiffs allege that Suno "risks overrunning the market with AI-generated music," that Suno outputs are "finding their way onto the major streaming services" where they "compete with the copyrighted sound recordings that enabled their creation," FAC ¶

12, and that those outputs "compete for plays against real, copyrighted sound recordings" and "substantially dilute the royalty pools that are paid out to artists," *id.* ¶¶ 79-80. In discovery, Plaintiffs confirmed that this theory relies directly on Plaintiffs' market performance on digital music platforms like Apple Music. For example, Universal contends that Suno outputs [redacted] Campbell Decl., Ex. 2 at 19 (Response to Interrogatory No. 24); *see also id.* at 18 (identifying Apple Music among the DSPs at issue); *id.*, Ex. 3 at 18 (Sony, same).

Plaintiffs' executives elaborated on that theory in Rule 30(b)(6) depositions.[2] UMG's North American CFO described the [redacted] Campbell Decl., Ex. 6 (Gallien Dep. 51:4-11). Sony's designee testified that Suno outputs have [redacted] *Id.*, Ex. 8 (Kooker Dep. 54:12-19). And UMG's Chief Digital Officer described the harm as [redacted] on the DSP platforms. *Id.*, Ex. 4 (Nash Dep. 344:4-18).

For its part, Suno asserts that any internal copying of Plaintiffs' sound recordings during the training phase of its transformative tool constitutes fair use. The factors that govern fair use are: "(1) the purpose and character of the use, including whether such use is of a commercial nature

---

[2]Suno has deposed, among others, UMG's Executive Vice President and Chief Digital Officer, Michael Nash ("Nash Dep."); UMG's Executive Vice President of Digital Business Development and Strategy, Jonathan Dworkin, who [redacted] ("Dworkin Dep."); UMG's Chief Financial Officer for North America, Jason Gallien ("Gallien Dep."); Sony's Executive Vice President and Head of Business and Legal Affairs and Global Digital Business, Jeff Walker, whose team [redacted] ("Walker Dep."); and Sony's President of Global Digital Business and U.S. Sales, Dennis Kooker ("Kooker Dep."). Campbell Decl., Ex. 4 (Nash Dep. 11:19-21), Ex. 5 (Dworkin Dep. 14:8-18, 15:1-3), Ex. 6 (Gallien Dep. 25:8-11), Ex. 7 (Walker Dep. 11:9-12:19), Ex. 8 (Kooker Dep. 9:7-10).

or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. Suno contends that its groundbreaking technology satisfies each of these factors—including that the alleged infringement did not impact "the potential market for or value of the copyrighted work" and, further, that Plaintiffs' dilution theory fails as a matter of law. To counter Suno's fair use defense, Plaintiffs have pointed to the precise "dilution" on streaming services Suno now seeks to contextualize in third-party depositions.[3]

Suno has also asserted the defense of copyright misuse, alleging that "Plaintiffs have engaged in anticompetitive activities that extend an unlawful monopoly over the production and commercialization of music." Campbell Decl., Ex. 9 (Ans. to Am. Compl. at 24); *see also* Mot. at 4:1-3. As relevant here, Suno contends that Plaintiffs leveraged the "must have" status of their entire music catalogs (each of which contain millions of sound recordings, including some of the world's most popular songs) to extract concessions from DSPs that have nothing to do with the scope of Plaintiffs' copyright rights—including restrictions on non-infringing AI-generated content. Plaintiffs are loud and proud about their ongoing attempts to get music streaming platforms to restrict AI-generated content on their platforms, even though Plaintiffs do not contend that such content infringes their copyrights. *See* FAC ¶ 53 ("Plaintiffs are not presently alleging that these outputs themselves infringe the Copyrighted Recordings . . . ."); Campbell Decl., Ex. 10 (Transcript of UMG Q4 2025 Earnings Call (Mar. 5, 2026) ("UMG Earnings Call Tr.") at 21:4-9 (discussing "anti-AI dilution provisions in numerous UMG agreements")). Indeed, UMG is [redacted] Campbell Decl., Ex. 4 (Nash Dep. 263:11-22 ([redacted])).

### C. Apple Music Is Directly Relevant to the Underlying Litigation

Apple attempts to minimize its importance to this case, claiming its "sole connection to the

---

[3]Suno maintains that the salient question is whether there has been harm to the *Asserted Works* (i.e., the allegedly copied sound recordings). But Plaintiffs are pursuing a broader theory that looks to their catalog-wide performance and market share on music streaming platforms, and Suno is entitled to discovery to test it.

matter is that its music streaming service, Apple Music, is one of several digital service providers ('DSPs') where the labels' and Suno's music can be played." Mot. at 1:7-9. That framing only highlights the relevance of Suno's requested discovery. Plaintiffs' complaint names Apple Music specifically as a service onto which Suno users upload their outputs. FAC ¶ 32. And Plaintiffs' theory of harm—that Suno-generated content has allegedly swamped DSP platforms, competing with and displacing their sound recordings—puts Apple Music (one of the largest music streaming services in the United States) at the center of both the fourth fair use factor and Plaintiffs' damages claim. Each of the four disputed topics in Suno's deposition subpoena goes to these core issues.[4]

**Apple's current or ongoing negotiations with Plaintiffs regarding music licensing, royalties, and artificial intelligence initiatives (Topic 2).** Notwithstanding Plaintiffs' bombastic allegations of harm in this litigation, Plaintiffs have been vocal about the protections they demand from DSPs like Apple to ensure that AI-generated music cannot dilute their market share or royalties. On UMG's most recent year-end earnings call, its Chief Digital Officer described "the thoughtful measures we've taken to neutralize any negative impact" from "AI revenue dilution": "anti-fraud provisions," "demonetization of generic AI slop under UMG artist centric agreements," and "anti-AI dilution provisions in numerous UMG agreements," which "generally mean that pure AI generated content similar to other non-music content is removed from the calculation of share of streams by the DSP for purposes of determining our artist royalties." Campbell Decl., Ex. 10 (UMG Earnings Call Tr. at 19:1-3, 21:2-14). He told investors that, as a result, UMG is "seeing no indication that AI royalty dilution is a material issue for UMG from a revenue perspective." *Id.* at 21:14-18.

Critical to this motion, Plaintiffs are [redacted] UMG's Chief Digital Officer [redacted]

[4]The topics as served appear in the Declaration of Miranda D. Means ("Means Decl."), Dkt. 1-1, Ex. 8 at 7-9. Each was narrowed during the meet-and-confer process, and Suno seeks testimony only on the topics as narrowed. *See* Means Decl. ¶ 24; *id.*, Ex. 5.

[redacted] Campbell Decl., Ex. 4 (Nash Dep. 262:2-24, 263:11-22). The executive responsible for UMG's negotiations with Apple testified that [redacted] *Id.*, Ex. 5 (Dworkin Dep. 32:17-23, 33:14-20, 35:14-36:2). He added that [redacted] *Id.* (Dworkin Dep. 37:17-38:5). Sony's designee likewise confirmed that [redacted] *Id.*, Ex. 7 (Walker Dep. 177:6-21). [redacted] UMG's CEO told investors that UMG is "working with" its established DSP partners, including Apple, on consumer-facing AI products, *id.*, Ex. 10 (UMG Earnings Call Tr. at 54:19-55:7), and Sony testified that [redacted] *id.*, Ex. 8 (Kooker Dep. 230:7-232:7, 233:9-18). Apple's testimony about the existence and scope of these negotiations is directly relevant to, among other issues, the alleged market for the Plaintiffs' works.

**Apple's ability to operate, and the viability of the Apple Music service, without the catalog of one or more Plaintiffs (Topic 4).** Plaintiffs are candid about the market impact of their catalogs and the negotiation leverage they provide. UMG tells investors that its catalog is "the biggest driver of new subscribers to the DS[Ps]" and has "earned a unique level of credibility and influence." *Id.*, Ex. 10 (UMG Earnings Call Tr. at 17:13-21). Its Chief Digital Officer testified that [redacted] *Id.*, Ex. 4 (Nash Dep. 140:20-22). This isn't just bluster: in early 2024, UMG pulled all of its content from TikTok in part because TikTok would not capitulate to UMG's demands regarding AI content on the platform, and UMG did not allow its content to return to TikTok until those demands and others

were met. Campbell Decl., Ex. 11 (Universal Music Group, *An Open Letter to the Artist and Songwriter Community – Why We Must Call Time Out on TikTok* (Jan. 30, 2024)); *id.*, Ex. 12 (Jem Aswad, *TikTok and Universal Music Group Settle Royalty Dispute With New Licensing Agreement*, *Variety* (May 1, 2024)).

**The types and frequency of streaming fraud on Apple Music, how it is discovered, its causes, and Apple's policies for responding to it (Topic 5).** The core of Suno's copyright misuse defense is that Plaintiffs use their copyright monopoly and "must have" catalog as a cudgel to extract broad, anti-AI concessions from DSPs. Plaintiffs' response is to assert that their crusade to extract anti-AI provisions from every DSP is, in fact, just a well-intentioned attempt to combat "streaming fraud." UMG's Chief Digital Officer told investors that most AI-generated content uploaded to streaming platforms "is AI slop or fraud fodder associated with royalty diversion schemes," and pointed to Apple itself: "Apple recently reported that its efforts to address the flood of AI uploads included exclusion of 2 billion fraudulent streams last year." Campbell Decl., Ex. 10 (UMG Earnings Call Tr. at 20:6-17); *id.*, Ex. 4 (Nash Dep. 243:21-244:2 (confirming statement)). Suno explained to Apple during the meet-and-confer process that, because Apple—not Plaintiffs—actually confronts streaming fraud, only Apple can say whether the fraud it encounters is in fact related to AI-generated content. Means Decl., Ex. 5 at 6, 12. As explained below, Suno has further narrowed this topic and, to address any security concerns, will exclude the technical details of Apple's detection and security methods. *See infra* § III.D.

**Apple's communications with Plaintiffs or their agents concerning Suno or this case (Topic 7).** As narrowed, this topic is limited to communications between Apple and Plaintiffs or their agents (such as Plaintiffs' trade organization the Recording Industry Association of America or the "RIAA") regarding Suno or this case. Means Decl., Ex. 5 at 12, 16. Plaintiffs have communicated directly with Apple about AI issues—including [redacted], Campbell Decl., Ex. 5 (Dworkin Dep. 35:14-36:25), and [redacted], Campbell Decl., Ex. 7 (Walker Dep. 175:6-176:6), though Sony [redacted], *id.* (Walker Dep. 176:20-177:5).

### D. Suno's Efforts to Seek Relevant Testimony From Apple

Apple devotes much of its Motion to a misleading summary of the meet-and-confer history, beginning with subpoenas that *Plaintiffs* served more than a year before Suno served anything. *See* Mot. at 1:13-22, 4:7-9:13. In truth, Suno served Apple with one document subpoena and one deposition subpoena, which it later was forced to serve again with a new date after Apple refused to provide witness availability. Means Decl. ¶¶ 11, 16, 23. Apple's recitation is inaccurate and not supported by the emails it attaches, and a few key moments bear emphasis.

Suno's July 31, 2026 cover letter for its deposition subpoena made clear that Suno was ready to work with Apple collaboratively to schedule the deposition. Means Decl., Ex. 6 at 4 (Suno's counsel offering that "[t]he date and location are entirely open to discussion"). When Apple objected to every topic and demanded wholesale withdrawal, Suno immediately offered to "meet and confer regarding the deposition subpoena, both with respect to the topics and the date of the deposition," *id.*, Ex. 5 at 21-22, and later agreed to take the noticed date off calendar so the discussions could continue, *id.* at 15-16.[5] Suno then narrowed the dispute at every turn to address Apple's concerns and reduce any perceived burden. Suno agreed to accept a declaration in lieu of testimony on five of the nine topics (Topics 1, 3, 6, 8, and 9) and on various aspects of its document subpoena, *id.* at 2-3, 5-6—and it has kept that agreement, accepting the Supplemental Bottoms Declaration Apple served on October 13 as resolving those matters. *See* Mot. at 8:21-23, 9:1-2. It narrowed Topic 7 to communications with Plaintiffs or their agents regarding Suno or this case, Means Decl., Ex. 5 at 12, 16; narrowed Topic 5 and explained that it would not be "a significant focus of a deposition," *id.* at 6, 12; and on Topic 2, identified the specific provisions and agreements at issue and then offered to "exclude past/signed agreements with Plaintiffs and limit this topic to any current or ongoing negotiations," *id.* at 6, 10-12.

Apple did not budge and flatly refused to provide any testimony, no matter what narrowing Suno proposed. On September 25, it stated that it "will not provide a witness" on Topics 2, 4, or

[5] Apple asserts that Suno "refused, that same day, to withdraw" the subpoena, Mot. at 7:16, but omits that the same email offered to confer on both the topics and the date. Means Decl., Ex. 5 at 21-22.

5, and treated Topic 7 as withdrawn. *Id.* at 4. Suno confirmed it was not withdrawing Topic 7 and re-served the subpoena with a new date, confirming in its cover email that—given the parties' agreement to resolve certain topics by declaration—the deposition would be limited to the four narrowed topics. *Id.* at 2-3; *id.*, Ex. 8.[6] If the record demonstrates anything, it is that Suno approached this process collaboratively and constructively, while Apple largely stonewalled.[7]

## III. ARGUMENT

### A. Legal Standard

The scope of discovery under Rule 45 is the same as under Rule 26(b). Fed. R. Civ. P. 45 Advisory Comm.'s Note (1970); *see also Waymo LLC v. Uber Techs., Inc.*, No. 17-cv-00939, 2017 WL 2929439, at *2 (N.D. Cal. July 7, 2017). A party may obtain discovery of "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case," considering, among other things, "the parties' relative access to relevant information" and "the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(1). Relevance "is defined broadly," *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 679-80 (N.D. Cal. 2006), and information "need not be dispositive of the entire issue disputed in the litigation in order to be discoverable by subpoena," *id.* at 686. Because this Court supervises discovery ancillary to an action pending in another district, it "should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder," and "[w]here relevance is in doubt . . . the court should be permissive." *Id.* at 681 (quoting *Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc.*, 813 F.2d 1207,

---

[6]Apple's Motion repeatedly mischaracterizes these discussions. Apple asserts that "Suno decided the parties were at an impasse," Mot. at 8:25, but it was Apple that had just declared, topic by topic, that it "will not provide a witness." Means Decl., Ex. 5 at 4. Apple asserts that "Suno admitted it had not reviewed the Bottoms Declaration," Mot. at 6:17-18, but the record shows only that Suno's counsel, after reviewing it, agreed it was "helpful context for a few of these points" and was willing to rely on it for portions of Suno's requests. Means Decl., Ex. 5 at 34. Apple asserts that Suno "continues to expand the scope of its requests" and "demanded more," Mot. at 2:4, 7:2-4, but Suno *narrowed* its data request to U.S.-only data from 2022 forward—which Apple ultimately agreed to provide. Means Decl., Ex. 5 at 3, 7, 31, 37. And Apple asserts that Suno seeks testimony on "agreements that long predate Suno," Mot. at 2:25-27, whereas Suno expressly offered to exclude past and signed agreements. Means Decl., Ex. 5 at 6.

[7]Apple notes that Plaintiffs have indicated a supplemental declaration may resolve their own deposition subpoena. Mot. at 2:1-3, 8:4-8. But Plaintiffs expressly reserved their right to depose Apple, Means Decl., Ex. 7 at 2, and Plaintiffs' view of what *they* need says nothing about what Suno needs to defend against Plaintiffs' theory of harm.

1211-12 (Fed. Cir. 1987)). And while the Court must limit discovery that it determines is unreasonably cumulative or obtainable from a more convenient source, Fed. R. Civ. P. 26(b)(2)(C)(i), it "must be careful not to deprive a party of discovery that is reasonably necessary to afford a fair opportunity to defend and prepare the case." *Gonzales*, 234 F.R.D. at 680 (quoting Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment).

Apple, as the party moving to quash, bears the burden of persuasion to show that the requested testimony is disproportionate or is unduly burdensome, while Suno must demonstrate that the information sought is relevant to the allegations and claims at issue. *Soto v. Castlerock Farming & Transp., Inc.*, 282 F.R.D. 492, 504 (E.D. Cal. 2012); *Hager v. Ariosa Diagnostics, Inc.*, No. 23-mc-80261-LB, 2023 WL 8654388, at *3 (N.D. Cal. Dec. 14, 2023) (denying a motion to quash a third-party deposition). In determining whether a subpoena poses an undue burden, courts "weigh the burden to the subpoenaed party against the value of the information to the serving party," *Soto*, 282 F.R.D. at 504 (quoting *Travelers Indem. Co. v. Metro. Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005)); *Gonzales*, 234 F.R.D. at 680 (court must balance "the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena"). A subpoenaed person's non-party status is a factor in that balance, but it does not relieve the movant of its burden: a party resisting discovery bears "the burden of clarifying, explaining and supporting its objections with competent evidence." *Philhower v. Philhower*, No. 8:24-cv-00074, 2024 WL 4720932, at *2 (C.D. Cal. Oct. 15, 2024) (quoting *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012)); *see also Lantiq Deutschland GmbH v. Ralink Tech. Corp.*, No. C-11-00234 EJD (PSG), 2011 WL 13394713, at *2 (N.D. Cal. Sept. 15, 2011) (rejecting a claim of undue burden because the party "only presents attorney argument" which "is insufficient to substantiate a claim of undue burden").

While courts have expressed "a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests," *Soto*, 282 F.R.D. at 505, that preference is not a bar. It yields where the serving party shows "a need to obtain [the information] from" the non-party. *Id.* (denying motion to quash in part); *cf. ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 530 (N.D. Cal. 2015) ("'the scope of discovery through a subpoena is the same

as that applicable to Rule 34 and the other discovery rules,' which in turn is the same as under Rule 26(b)").

A court may also quash or modify a subpoena that requires disclosure of "confidential research, development, or commercial information." Fed. R. Civ. P. 45(d)(3)(B)(i). But "there is no absolute privilege for trade secrets and similar confidential information." *Gonzales*, 234 F.R.D. at 685 (quoting *Centurion Indus., Inc. v. Warren Steurer and Assoc.*, 665 F.2d 323, 325 (10th Cir. 1981)). The non-party must first show that the information is "important proprietary information" and make "a strong showing that it has historically sought to maintain the confidentiality of this information." *Id.* at 684 (quotation omitted). Only then does the burden shift to the serving party to show a substantial need. *Id.* And even where that showing is made, the Court may, "instead of quashing or modifying a subpoena, order appearance or production under specified conditions." Fed. R. Civ. P. 45(d)(3)(C).

Finally, a non-party seeking a protective order under Rule 26(c) must show "good cause," which requires a showing "that specific prejudice or harm will result" absent the order. *Williams v. County of San Diego*, No. 17-cv-00815-MMA (JLB), 2019 WL 5963969, at *4 (S.D. Cal. Nov. 13, 2019) (quotation omitted). The movant bears a "heavy burden," *United States v. Capriotti*, No. 1:11-cv-847, 2012 WL 2994244, at *2 (E.D. Cal. July 20, 2012), and "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test," *Fausto v. Credigy Servs. Corp.*, No. C 07-5658, 2008 WL 4793467, at *2 (N.D. Cal. Nov. 3, 2008) (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)).

### B. The Four Topics at Issue Are Directly Relevant to the Claims and Defenses in the Case

Apple measures relevance against the wrong question, asserting repeatedly that the topics have "no apparent relevance to Suno's training models on Plaintiffs' works." Mot. at 2:5-6; *see also id.* at 2:27-28. But discovery extends to any nonprivileged matter "relevant to any party's claim or defense," Fed. R. Civ. P. 26(b)(1), not merely to the act of alleged infringement.

In this case, Apple's position as one of the premier music streaming platforms in the United States places it squarely at the center of this case—most notably Plaintiffs' allegations of harm and

market impact, which rely almost exclusively on what allegedly happened on DSP platforms like Apple Music, as well as Suno's copyright misuse defense, which concerns Plaintiffs' efforts to force DSPs like Apple to suppress AI content. *See supra* § II.B-C. Critically, in testing Plaintiffs' theory, Suno "need not rely solely on what Plaintiff[s] contend[] is relevant," *Waymo*, 2017 WL 2929439, at *2, and is entitled to seek discovery from the music streaming platforms that Plaintiffs put squarely in the middle of this case.[8]

**1. Apple's Contract Negotiations With Plaintiffs And Implementation of Such Contracts Are Relevant**

Apple's contracts with Plaintiffs bear on three issues in the case. ***First***, they bear on Plaintiffs' claimed harm—i.e., the alleged dilution of Plaintiffs' royalties and share of the music streaming market (including on Apple Music) as a result of AI-generated music. Plaintiffs' contracts with Apple define what Plaintiffs are paid for the use of their recordings on Apple's platform, when they are paid, how Apple assesses Plaintiffs' share of the streaming market, and exactly how royalties are calculated. This includes things like guaranteed minimum royalties (which are paid regardless of whether AI content is or is not present in the market) and contractual provisions that specifically *exclude* AI-generated content from the royalty pool (meaning that, mathematically, AI content cannot "dilute" Plaintiffs' royalties). Further, the ways in which Apple *implements* those provisions in the real world will determine what actually happened to Plaintiffs during the period at issue. ***Second***, Apple's contracts and negotiations with Plaintiffs are relevant to Suno's fair use defense, particularly to the extent they address whether and on what terms Apple will license Plaintiffs' content, e.g., to develop Apple's own AI models. Indeed, a core question

[8] Apple's authorities do not suggest otherwise. In *Williams v. County of San Diego*, the court quashed a subpoena to a seven-year-old non-party whose therapist attested that a deposition would "likely cause psychological decompensation," and found the testimony irrelevant only after the plaintiffs' counsel represented "under penalty of perjury" that the primary issue on which testimony was sought was "not an issue—or even a subissue—in this case." 2019 WL 5963969, at *6-8. Nothing similar is true here. Apple's other authorities are likewise inapposite. In *Gilead Sciences*, the requesting party already had a laboratory notebook and confirming letter disproving the very thing it sought to probe. *Gilead Sciences, Inc. v. Merck & Co.*, No. 5:13-cv-04057, 2016 WL 146574, at *1-2 (N.D. Cal. Jan. 13, 2016). And *Cacique* holds only that enforcing a request for *irrelevant* information is an abuse of discretion. *Cacique, Inc. v. Robert Reiser & Co.*, 169 F.3d 619, 622-25 (9th Cir. 1999). Neither case is relevant here, where the topics go directly to Plaintiffs' core theories and Suno's defenses.

behind fair use factor four is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Plaintiffs allege that Suno threatens "the future market for licensing sound recordings to generative AI companies," FAC ¶ 78—and [redacted]. *See supra* § II.C. ***Third***, Apple's negotiations with Plaintiffs bear on Suno's copyright misuse defense, because negotiations to restrict Apple's ability to offer AI-generated content, or to steer toward lower-cost content, would show that Plaintiffs are using their copyrights to extract limits on non-infringing AI content. [redacted]. *See supra* § II.C.

If anything, Apple's testimony about its contractual relationship with Plaintiffs has become more significant as this case has progressed. [redacted]. Campbell Decl., Ex. 7 (Walker Dep. 88:22-89:3 [redacted])); *id.*, Ex. 4 (Nash Dep. 344:19-345:1 [redacted])); *id.*, Ex. 5 (Dworkin Dep. 340:5-9). Universal's interrogatory responses say the same: [redacted] *Id.*, Ex. 2 at 7 (UMG Response to Interrogatory No. 15). Because Plaintiffs put the give-and-take of their DSP negotiations at issue, including as a discrete form of the actual damages claimed, Suno must be entitled to develop testimony and hear from the other side of the table: Apple.

Apple's contrary arguments do not withstand scrutiny. *First*, Apple asserts that its negotiations with Plaintiffs "long predate Suno's existence in 2021." Mot. at 11:16-17; *see also id.* at 2:25-28. As an initial matter, the evolution of these relationships over time—and specifically how they changed after Suno launched publicly in 2023—is clearly relevant to assessing Plaintiffs' claims. Regardless, Suno agreed to narrow this deposition topic to exclude past and signed

agreements and to limit the deposition topic to current and ongoing negotiations. Means Decl., Ex. 5 at 6.

*Second*, Apple asserts that it "does not currently exclude AI-generated content from its royalty pool," and that Suno "can see what is being paid for" Suno-identified tracks. Mot. at 11:23-26. But [redacted]—underscoring the need to understand what Plaintiffs are demanding and how Apple has responded. *See supra* § II.C. Apple's position also conflicts with UMG's testimony that [redacted]," Campbell Decl., Ex. 5 (Dworkin Dep. 37:17-25), indicating both [redacted] and that Suno needs Apple's testimony to understand how it has been operationalized, an issue that only Apple can address.

*Third*, Apple asserts that "Suno has never identified any specific contractual provision at issue." Mot. at 12:2-3. That is false. The subpoena identifies four specific categories of provisions, Means Decl., Ex. 8 at 8, and Suno's counsel later identified the specific agreements on which Suno intended to focus, *id.*, Ex. 5 at 10-12.

*Fourth*, Apple asserts that its existing declaration describes its AI policies, "none of which support Suno's theory." Mot. at 12:3-5. Apple's description of its own policies is not a substitute for testimony about what Plaintiffs have demanded, what is being negotiated now, and how Apple has implemented what it has agreed to—and Suno is entitled to test Apple's characterization, not simply accept it.

### 2. Apple's Assessment of the Commercial Viability of Its Platform Without Plaintiffs' Content Is Relevant

Topic 4 goes to Suno's copyright misuse defense. Apple argues that misuse "turns on Plaintiffs' conduct," so Apple's assessments "have no bearing on whether or how Plaintiffs improperly leveraged their copyrights." Mot. at 12:15-20. But whether Plaintiffs had the leverage and ability to engage in the misuse Suno alleges is plainly relevant. *See Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990) (finding copyright misuse where plaintiff attempted "to use its copyright in a particular expression, the Interact software, to control competition in an

area outside the copyright"); *see also Covetrus, Inc. v. Actian Corp.*, No. 21-cv-00097, 2024 WL 4581285, at *2 (D. Me. Oct. 25, 2024) (permitting discovery relating to plaintiffs' copyright misuse defense to defendant's counterclaim where plaintiffs alleged that defendant participated in an impermissible licensing scheme).

A copyright holder whose catalog is easily replaced has little ability to extract concessions beyond the scope of its copyright; one whose catalog is a "must have" has a great deal. Plaintiffs will surely contend at trial that they could not possibly "misuse" their copyrights against a company as large and powerful as Apple. Suno is entitled to test that contention against Apple's own view of how essential Plaintiffs' catalogs are to Apple Music—particularly given Plaintiffs' statements about their leverage and the [redacted] they spend to extract AI-related terms. *See supra* § II.C; Campbell Decl., Ex. 5 (Dworkin Dep. 142:15-23); *id.*, Ex. 7 (Walker Dep. 236:7-16).

Apple's own authority establishes the relevance of this testimony. In *Practice Management Information Corp. v. American Medical Ass'n*, the Ninth Circuit found misuse because the AMA's license imposed a "limitation . . . on [the licensee's] rights to decide whether or not to use" competing products, and it emphasized that "[t]he adverse effects of the licensing agreement are apparent." 121 F.3d 516, 521 (9th Cir. 1997), *amended by* 133 F.3d 1140 (9th Cir. 1998). The misuse inquiry thus includes evidence regarding the licensee (here, Apple), including the restrictions imposed on it and their effects. Apple's dependence on Plaintiffs' catalogs, and the constraints Apple faces in deciding whether to accede to Plaintiffs' demands to suppress competing music content, are squarely relevant.

Apple's remaining objections fare no better. The term "commercial viability" is not vague, Mot. at 12:8-9; the topic clearly defines what it covers, Means Decl., Ex. 8 at 8, and Apple understood it well enough to object at length, *id.*, Ex. 5 at 24. Nor does the topic call for Apple's speculation, Mot. at 15:8-10; it seeks Apple's actual analyses and the actual effects of any loss of access that "has resulted." Means Decl., Ex. 8 at 8. If no such assessments exist, the testimony will not be extensive or burdensome, which weighs *against* quashing the topic. Further, Apple's charge of "a fishing expedition by a new entrant to the music industry," Mot. at 12:10-11, ignores that the

testimony can be designated "Highly Confidential – Outside Counsel Only," so that no one at Suno would ever see it. *See infra* § III.D.

### 3. Apple's Approach to Streaming Fraud Is Relevant

Apple's principal argument against Topic 5 is that Suno has pointed only to Plaintiffs' *public* statements about streaming fraud, rather than statements made "in this litigation." Mot. at 12:26-13:4. That distinction is irrelevant. Plaintiffs' position is their position—whether stated "in this litigation" or not—and UMG's Chief Digital Officer explaining to investors why UMG has extracted anti-fraud and anti-dilution provisions from DSPs is hardly a "vague public statement." *Supra* § II.C. In any event, Plaintiffs' witnesses testified repeatedly in this litigation that AI-generated content is supposedly linked to streaming fraud. Campbell Decl., Ex. 7 (Walker Dep. 15:3-6 [redacted] *id.*, Ex. 8 (Kooker Dep. 62:21-25 [redacted])); *id.*, Ex. 4 (Nash Dep. 248:16-23 ([redacted]

The record thus belies Apple's assertion that Plaintiffs "disclaimed" any streaming-fraud argument and "expressed confusion and surprise" when Apple raised it. Mot. at 2:20-23, 12:28-13:1. Indeed, Plaintiffs' own deposition subpoena to Apple included a streaming-fraud topic, and according to Apple's summary of its conferral, Plaintiffs "indicated they intend to stand on whatever position Suno takes on this topic." Means Decl., Ex. 7 at 3. Apple's contrary characterization rests entirely on its counsel's description of an unrecorded call. Means Decl. ¶ 20. Moreover, what Apple seems to be saying is that Plaintiffs' public statements concerning streaming fraud contradict what they told Apple in private. Resolving that conflict is all the more reason for testimony from Apple.

Apple's other arguments miss the mark. That Suno itself "is not accused of streaming fraud," Mot. at 2:16-18, is beside the point. Streaming fraud is relevant because Plaintiffs invoke it to justify their attempts to prevent competition from non-infringing music content, conduct that is at the heart of Suno's copyright misuse defense. And Apple faults Suno for not identifying "what restrictions it is claiming Apple took related to AI based on Plaintiffs' supposed concerns about

streaming fraud." *Id.* at 13:5-10. Exactly—that is why Suno needs the testimony. Suno cannot be faulted for failing to describe in advance the very facts it seeks to discover from the only entity that has them.

**4. Apple's Communications With Plaintiffs Regarding Suno Are Relevant**

Communications between Plaintiffs and Apple about Suno or this case go directly to whether Plaintiffs have targeted Suno-generated content on Apple's platform, what they have demanded of Apple with respect to it, and what they have told Apple about the claims in this case. These are not hypothetical concerns: [redacted]. *See supra* § II.C.

Apple argues that the topic would "sweep in even a passing comment about Suno's existence," and that Apple's "thoughts about Suno are not relevant." Mot. at 13:12-14. But the topic is limited to Apple's communications *with Plaintiffs and their agents*; it does not seek Apple's internal views. And a "passing comment" by Plaintiffs to Apple about Suno is exactly the kind of evidence that would show whether Plaintiffs have pressed Apple to act against Suno-generated content. Nor must Suno identify "specific documents on which it wants a witness prepared," Mot. at 13:18-19; Suno is equally entitled to testimony about any meetings or oral communications that may never have been reduced to writing.[9]

**C. The Four Topics Are Not Equally Obtainable From Party Discovery**

Apple suggests that if Suno can obtain *any* discovery from Plaintiffs on a topic, it should be barred from obtaining deposition testimony from Apple. Mot. at 14:2-15:18. That is not the law. Apple's own authorities show that the preference for party discovery yields where the requesting party explains what it needs and why the non-party is the source. In *Soto v. Castlerock Farming & Transport, Inc.*—the case Apple cites for that preference—the court *denied* the non-party's motion to quash in part, because the requesting party "established a need to obtain these

[9] Apple asserted in conferral that this topic implicates privileged communications. Means Decl., Ex. 5 at 14-15, 27. It has abandoned that objection, as it must: the topic concerns only communications between Apple and third parties.

documents from" the non-party and there was "no evidence" that compliance "would pose any significant burden." 282 F.R.D. at 505-07. And in *In re Subpoena to Produce Documents of Clapp, Moroney*, the court denied the motion to quash the deposition subpoena (the witness having agreed to sit again), compelled the documents bearing on the claims notwithstanding the non-party's confidentiality objection, and quashed only requests for which the requesting party had "made no showing as to relevance" and that sought a *party's* knowledge, not the non-party's. 2014 WL 3784112, at *1, *4 (N.D. Cal. July 31, 2014). Apple's remaining cases involved information that sat with a party, or that the non-party had already provided, and requesting parties that offered no justification at all for going to the non-party. *Intermarine* involved a storage provider (Dropbox) asked about a party's own account—on which that party was "the best witness"—and information already public or covered by a records certification. *Intermarine, LLC v. Spliethoff Bevrachtingskantoor, B.V.*, 123 F. Supp. 3d 1215, 1217-19 (N.D. Cal. 2015). In *In re Subpoena to Apple Inc.*, the requesting party sought Apple's communications with the defendant, which the defendant also possessed, and "ha[d] not provided any reason" it could not get them from the defendant. 2014 WL 2798863, at *3 (N.D. Cal. June 19, 2014). By contrast, here [redacted] *See supra* § II.C.[10]

Indeed, the testimony Suno seeks can only come from Apple. On Topic 2, every negotiation has two sides, and Plaintiffs' account of their own demands is no substitute for the account of the

---

[10] Apple's other authorities are similarly inapposite. In *Electronic Scripting Products, Inc. v. HTC America, Inc.*, the non-party had already sat for "a broad and lengthy deposition," the requesting party offered "little more than labels and conclusory statements," and the topics sought the non-party's own business information "without even a hint of relevance" to the claims. 2021 WL 3773607, at *1, *3-4 (N.D. Cal. Aug. 25, 2021). In *Personal Audio LLC v. Togi Entertainment, Inc.*, the information sought—whether the defendants had funded or assisted the non-party's patent challenge—"should be in the possession of the party defendants," and its relevance turned on a ruling the Patent Trial and Appeal Board had not yet made. No. 14-mc-80025 RS (NC), 2014 WL 1318921, at *2-3 (N.D. Cal. Mar. 31, 2014). In *Price v. Peerson*, a pro se plaintiff sought testimony from Department of Justice employees about a video recording that did not exist, after he had already deposed the responsible agency's witness, from deponents with "less or no information" than the party. No. CV 13-03390, 2014 WL 12687411, at *1 (C.D. Cal. Apr. 8, 2014). In *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, the requesting party conceded it did "not know whether [the witness] has relevant information." 300 F.R.D. 406, 411 (C.D. Cal. 2014). None of that describes this case.

counterparty that received them. For example, Apple's unique perspective on licensing Plaintiffs' copyrighted works—including whether Apple considered licensing the Plaintiffs' works for its own AI-related projects, or whether Apple's licensing position was influenced by the emergence of Suno—are relevant to Suno's fair use defense, including "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4); *see also Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985) ("This last factor is undoubtedly the single most important element of fair use."). Apple will also have unique testimony about its approach to Plaintiffs' demands that Apple restrict non-infringing AI-generated content, *see supra* § II.C, which is directly relevant to copyright misuse and whether Plaintiffs are trying "to secure an exclusive right or limited monopoly not granted by the Copyright Office." *Practice Mgmt.*, 121 F.3d at 520 (quoting *Lasercomb*, 911 F.2d at 977-79). And while prior executed agreements have been produced, Means Decl., Ex. 7 at 8-9, those agreements cannot possibly show what is being negotiated now, what restrictions Apple currently faces, or how Apple has actually operationalized the provisions it agreed to. Indeed, while [redacted], they could not answer many basic questions about the process or Apple's position. Campbell Decl., Ex. 7 (Walker Dep. 178:3-11 [redacted])); *id.*, Ex. 5 (Dworkin Dep. 33:16-18 [redacted]), 37:25-38:3 [redacted] Plaintiffs' witnesses also repeatedly disclaimed the ability to testify about DSPs' positions or how they have implemented various provisions and restrictions on AI content. *Id.*, Ex. 6 (Gallien Dep. 75:20-76:4 ([redacted]), 170:12-15 [redacted])); *see also id.* (Gallien Dep. 76:16-22). Topic 7 is the same: Plaintiffs' productions cannot capture oral communications or Apple's side of them, and [redacted]. *See supra* § II.C.

Topics 4 and 5 are even more plainly within Apple's unique knowledge. Only Apple can testify to *Apple's* view of whether Apple Music would be viable without Plaintiffs' catalogs. And

because Apple is the only entity to observe, detect, and combat actual streaming fraud that occurs on its platform, that is a topic that must be explored with Apple itself. Plaintiffs' witnesses concede that fraud is "[redacted]" and handled differently "[redacted]," Campbell Decl., Ex. 4 (Nash Dep. 245:19-25); that their understanding of any AI-fraud link comes from what they "[redacted]," *id.*, Ex. 5 (Dworkin Dep. 78:6-11); and [redacted], *id.*, Ex. 7 (Walker Dep. 120:5-18).

Apple misses the point in arguing that Plaintiffs can explain their reasons for demanding contractual concessions. Mot. at 15:6-18. Suno seeks the facts—e.g., Apple's dependence on Plaintiffs' catalogs and the reality of streaming fraud on Apple Music—against which those reasons must be tested. Nor does it matter that Apple is "one of the many subpoenaed non-party music services." *Id.* at 3:8-10. Each DSP uniquely knows its own negotiations and its own platform. *See Gonzales*, 234 F.R.D. at 685-86 (finding substantial need for the market leader's data even though other search engines were producing similar data, because the study "may be significantly hampered if it did not have access to some information from the most often used search engine").

**D. Confidentiality Is Not a Bar to a Deposition**

An extensive protective order is in place in the Massachusetts Litigation. Campbell Decl., Ex. 13 (Amended Confidentiality Stipulation and Protective Order ("Protective Order")). It extends its protections to non-parties, *id.* ¶ 19, and includes a "Highly Confidential – Outside Counsel Only" tier, *id.* ¶ 15, under which testimony cannot be shared with Plaintiffs' or Suno's business personnel or with any other DSP. That fully answers Apple's concern about its "negotiating positions with the business partners that are parties to this litigation" and its "competitive standing with other services." Mot. at 3:14-16. Apple has identified no deficiency in that order. To the contrary, under that very same protective order, Apple already produced data and a declaration that it now calls highly sensitive, *see* Mot. at 5 n.3, 9 n.5, and further agreed to let Plaintiffs disclose Apple's "HIGHLY CONFIDENTIAL" information to Plaintiffs' experts, Means Decl., Ex. 7 at 6, 8-9.

Apple's showing of confidentiality is also conclusory. Its declarant attests only in general

terms that Apple treats its negotiations, its streaming-fraud policies, and its internal assessments "to the extent any exist" as confidential. Decl. of Sam Bottoms, Dkt. 1-10 ("Bottoms MTQ Decl.") ¶¶ 4-6. But confidential commercial information is not immune from discovery, as the court recognized in *Gonzales v. Google, Inc.*, the case on which Apple principally relies. Mot. at 10:18-23, 16:11-12. There, the court ordered production, explaining that "the selective disclosure of protectable trade secrets is not per se unreasonable and oppressive, when appropriate protective measures are imposed," and directing that the information "be subject to the protective order in the underlying case." *Gonzales*, 234 F.R.D. at 686, 688 (internal quotation marks omitted). The same result follows here: Suno has shown a substantial need for testimony from one of Plaintiffs' largest DSP partners, *see supra* §§ III.B-C, and the appropriate condition is designation under the existing Protective Order.[11]

Apple's concern about streaming-fraud detection methods is likewise misplaced. Apple asserts that if "the 'how' behind Apple's detection and security methods regarding streaming fraud" became public, "malicious actors would plot ways to bypass Apple's security measures." Mot. at 15:25-27; *see also* Bottoms MTQ Decl. ¶ 5. Suno is not interested in the "how," and Apple never raised this concern in its written meet-and-confer correspondence. *See* Means Decl., Ex. 5 at 4, 14, 24. To eliminate any doubt, Suno agrees that the technical details of Apple's detection and security methods are outside the scope of Topic 5. Suno seeks only (1) the categories of streaming fraud of which Apple is aware; (2) generally, how Apple responds to streaming fraud; and (3) whether Apple is aware of any link between AI-generated content and streaming fraud and, if so, what that link is. None of that would reveal how Apple's security measures work.

Apple's reliance on *Philhower v. Philhower* is misplaced. The subpoenas there sought fourteen years of personnel files for up to 100 non-party employees and an individual's personal bank records, implicating constitutional privacy rights; the requesting party had refused to narrow them; and the court found the asserted relevance "at-best speculative." 2024 WL 4720932, at *3-

[11]Similarly, in *Waymo*, the court compelled the plaintiff's commercially sensitive deal documents on an outside-attorneys'-eyes-only basis, explaining "that the documents are commercially sensitive does not make them non-discoverable." 2017 WL 2929439, at *2.

6. Moreover, the court specifically noted the plaintiffs' production of protected material in a separate state-court action (which the defendants argued violated the protective order at issue) in concluding that the protective order was not a sufficient safeguard. *Id.* at *5-6. Apple omits that predicate, Mot. at 16:8-10, and nothing comparable has happened here.[12]

**E. Apple Has Not Shown Any Undue Burden**

Apple invokes Rule 45's "undue burden" standard, Mot. at 10:4-16, but identifies no actual burden in preparing a witness on four narrow topics. Neither of its declarants says anything about the time, cost, or effort that would require. *See generally* Means Decl.; Bottoms MTQ Decl. That silence is telling, because Apple bears the burden on this point. *See supra* § III.A.

Apple instead relies on the cumulative history of "six subpoenas," "over 90 emails," and "over 10 conferrals." Mot. at 1:13-18. But Suno served only two subpoenas: a limited document subpoena and a limited deposition subpoena, which has now been winnowed down to four narrow topics. Apple's gymnastic attempts to warp the procedural history—such as counting separately a single deposition subpoena that Suno was forced to serve again with a new date after Apple refused to present a witness, *see* Means Decl. ¶¶ 16, 23 (conceding the re-served subpoena is "identical to the original except for the date")—should be rejected. *See* Mot. at 1:14 (claiming "six subpoenas").

**F. A Protective Order Is Also Inappropriate**

Apple does not explain what protective order it seeks or how that relief differs from its motion to quash. To the extent Apple seeks to forbid the deposition entirely, its request is the motion to quash by another name, and it fails for the same reasons. Apple has not made the particularized showing of specific harm that its own authorities require, *see supra* § III.A, and the protective orders it cites bear no resemblance to this case. *See* Mot. at 16:21-17:7; *Capriotti*, 2012 WL 2994244, at *1-3 (improperly noticed depositions of individual IRS employees, rather than the government plaintiff, on matters the party lacked standing to contest); *Fausto*, 2008 WL

---

[12] *SPS Technologies, LLC v. Briles Aerospace, Inc.* is likewise inapposite: the non-party there was a direct competitor of both parties, documented its confidentiality measures in detail, and was asked about its own unsuccessful efforts to qualify a competing product—information that was "duplicative or superfluous" to evidence already before the court. 2019 WL 13108018, at *1-2 (C.D. Cal. June 24, 2019).

4793467, at *1-2 (deposition of opposing counsel of record, which was subject to a heightened test for attorney depositions that the issuing party failed to meet).

**G. Transfer Pursuant to Rule 45(f)**

Rule 45(f) permits the court where compliance is required to transfer a motion to the issuing court "if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). The schedule in the underlying litigation is brisk. Fact discovery will close on November 20; expert disclosures are due on January 28, 2027; and dispositive motions are due in June 2027. *UMG Recordings, Inc. v. Suno, Inc.*, No. 1:24-cv-11611-FDS (D. Mass.), Dkt. 284. Suno's priority is therefore to obtain all outstanding discovery as soon as possible, including Apple's deposition on the four disputed topics. Given that this dispute is already on file in this district and is set for hearing on December 1, Suno respectfully submits that transfer is not appropriate and that this Court should resolve the pending dispute.

**IV. CONCLUSION**

For the foregoing reasons, Suno respectfully requests that the Court deny Apple's Motion in its entirety and order Apple to produce a designee to testify on Topics 2, 4, 5, and 7 of the deposition subpoena, as narrowed during the parties' meet-and-confer discussions, within fourteen days of the Court's order or on another date agreed by the parties, subject to designation under the Protective Order.

Respectfully Submitted,

DATED: October 27, 2026

CAMPBELL FIRM, PC

By: */s/ Christopher B. Campbell*
CHRISTOPHER B. CAMPBELL

Attorney for Defendant Suno, Inc.